880 P.2d 1074

In re AMERICA WEST AIRLINES, INC., a Delaware corporation, Debtor.

AMERICA WEST AIRLINES, INC., a Delaware corporation, Debtor and Debtor–In–Possession, Movant,

v.

DEPARTMENT OF REVENUE, Respondent.

No. CV–93–0003–CQ.

Supreme Court of Arizona, En Banc.

Sept. 13, 1994.

Streich Lang by Robert E. Miles, John A. Swain, David V. Millard, Phoenix, Special Counsel, for America West Airlines, Inc.

Grant Woods, Atty. Gen. by Steven R. Partridge, James M. Susa, Phoenix, for Dept. of Revenue.

## OPINION

FELDMAN, Chief Justice.

The United States District Court for the District of Arizona certified three questions of Arizona law arising in a bankruptcy case in which America West Airlines, Inc. (America West) challenged the constitutionality of ad valorem[1] property taxes levied against some of its flight property by the Arizona Department of Revenue (Department). We accepted certification of the following questions:

1. Do A.R.S. §§ 42–162, 42–705(A), and 42–705(C) create a system of taxation that taxes property in the same class non-uniformly in violation of article 9, § 1 of the Arizona Constitution?

2. Does A.R.S. § 42–705(C) alone, or in conjunction with A.R.S. § 42–705(A), arbitrarily classify "Small Aircraft" in violation of article 2, § 13 of the Arizona Constitution?

3. Does A.R.S. § 42–705(C), which imposes a tax rate cap on the flight property of airline companies whose aircraft meet certain average size requirements, violate article 4, § 19 of the Arizona Constitution?

We have jurisdiction under Ariz. Const. art. 6, § 5(6), A.R.S. § 12–1861, and Ariz. R.Sup.Ct. 27(a).

## FACTUAL AND PROCEDURAL BACKGROUND

With its corporate headquarters and major hub in Arizona, America West operates an aircraft fleet providing passenger and cargo

---

1. An ad valorem tax is one levied on real or personal property in the form of a percentage of its value. BLACK'S LAW DICTIONARY 51 (6th ed. 1990).

service inside and outside of our state. Like all other airline companies operating in Arizona, America West pays annual ad valorem flight property taxes to the Department. *See* A.R.S. § 42–701.

On June 27, 1991, America West filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On February 27, 1992, America West filed a Motion Pursuant to Bankruptcy Code § 505 for Determination of Legality of Ad Valorem Flight Property Tax. In this motion, America West maintained that Arizona's annual ad valorem flight property tax unlawfully discriminated against America West.

For Arizona ad valorem tax purposes, flight property includes "all airline company aircraft of the types used in Arizona except aircraft permanently removed from operations." A.R.S. § 42–701(5). In computing the annual ad valorem flight property taxes for each airline, the Department first determines the full cash value of the flight property apportionable to Arizona. §§ 42–702 to 42–704. The Department then sets an assessed valuation, which it multiplies by the applicable tax rate to determine the tax due. § 42–227.

The ad valorem tax rate for flight property is determined under § 42–705(A), subject to § 42–705(C)'s exception imposing a one percent rate cap on the flight property of airlines with either a system-wide average passenger capacity below fifty-six seats or a system-wide average payload capacity below 18,000 pounds. Thus, if an airline company falls within the § 42–705(C) exception, *all* of its airplanes—whether large or small—benefit from the provision.

This subsection is obviously intended to encourage commuter service in Arizona by giving commuter airlines flying small airplanes to rural locations a lower effective tax rate. America West's fleet included small (or commuter) aircraft. In particular, it had a number of DHC–8 (Dash–8) aircraft, which qualified as small aircraft because they had a payload capacity of about 9,000 pounds and contained only thirty-seven seats each. However, America West also flew many much larger aircraft on its interstate routes. Because of its specific mix of airplanes, how-

ever, America West did not qualify for the § 42–705(C) tax break. Its system-wide average seating capacity exceeded fifty-six seats and its system-wide average payload capacity exceeded 18,000 pounds. As a result, *none* of its aircraft—not even the small ones—benefitted from the one percent tax rate cap.

During the tax years at issue (1989 and 1990), America West flew intrastate routes similar or identical to those flown by competitors that profited from the one percent tax rate cap. Of the thirty-five airlines subject to the flight property tax in 1989, twelve flew small aircraft in Arizona. The tax rate cap helped each of these companies. Similarly, of the thirty-one airlines subject to the tax in 1990, eleven flew small aircraft. In both years, America West was the only airline providing commuter service in rural Arizona that did not benefit from the tax rate cap.

At least two of the airlines aided by the tax rate cap have licensing or code-sharing agreements with large, national airlines. This arrangement means that the Arizona small airplane operations of these airlines qualify for the one percent tax break. America West itself has now entered into a code-sharing agreement (with Mesa Airlines, Inc.). As a result, America West's operations can now also indirectly receive the tax break offered by § 42–705(C). However, America West did not adopt this stratagem until after the subject tax years.

In 1989 and 1990, America West timely paid taxes on its small aircraft under protest. The total tax payment of $699,216 allocated to those aircraft for the two years was $436,437 *greater* than the payments would have been under the one percent tax rate cap. In fact, for tax years 1989 and 1990 combined, the taxes imposed on America West's flight property exceeded two percent of its full cash value.

After America West filed its motion in the bankruptcy court, counsel for America West and the Department agreed that the motion's merits involved important issues of first impression under Arizona law. When the District Court certified the questions of law, we

accepted certification. *See* Ariz.R.Sup.Ct. 27(a); Ariz.R.Civ.App.P. 23(c)(4).

## DISCUSSION

### A. The tax uniformity clause and these tax statutes

■ America West argues that the scheme for levying annual flight property taxes against airline companies operating in Arizona violates Ariz. Const. art. 9, § 1 because the state was taxing some of its flight property at a higher rate than identical property owned by competing airline companies eligible for the tax cap provided by A.R.S. § 42–705(C). The Arizona constitutional provision on which America West relies provides that "[a]ll taxes shall be *uniform upon the same class of property* within the territorial limits of the authority levying the tax." Ariz. Const. art. 9, § 1 (emphasis added).

The legislature has adopted a basic classification statute that, in its present version, creates eleven distinct classes for ad valorem taxes on all Arizona real and personal property. In pertinent part, the law provides:

A. There are established the following classes of property for taxation:

\*    \*    \*    \*    \*    \*

7. Class seven:

(a) All real and personal property of railroad companies used in the continuous operation of a railroad valued under chapter 4, article 4 of [Title 42] and not included in class nine.

(b) All real and personal property used in the operation of private car companies valued under chapter 4, article 3 of [Title 42].

(c) *Flight property* valued under chapter 4, article 1 of [Title 42].[2]

A.R.S. § 42–162 (emphasis added; footnotes omitted).

America West contends that "flight property" under this statute is a single property class that must be taxed at one rate under our constitution's uniformity clause. If § 42–162(A)(7)(c) were the only statute on the subject, there would be no difficulty with that position. However, as the Department

points out, America West's skies are clouded by § 42–705(C), which provides:

The annual tax levied against an airline company operating in this state which has a systemwide average passenger capacity of less than fifty-six seats or a systemwide average payload capacity of less than eighteen thousand pounds shall not exceed one per cent of the full cash value of all flight property of such airline company operated in this state.

We assume, as the Department urges, that this statute creates a separate classification of flight property (even though it is § 42–162 that creates tax classifications) so that airplanes owned by a small airline—one fitting the passenger and payload limits of § 42–705(C)—would be taxed at the maximum rate of one percent of their full cash value while all large airlines might pay a higher tax rate on similar flight property because they did not qualify under § 42–705(C). For example, an America West Dash–8 used for commuter purposes within Arizona would be taxed at a higher rate than an identical airplane used by America West's qualifying competitor for the same purpose. Thus, the primary issue is whether Ariz. Const. art. 9, § 1 allows the legislature to create different classifications for and thus impose nonuniform taxes on identical property used for the same purpose by owners in the same industry.

### B. Standards for reviewing tax classifications

The uniformity clause of art. 9, § 1—"all taxes shall be uniform on the same class of property"—imposes greater limits on state taxing authorities than the federal equal protection clause. *See Nashville C. & St. Louis Ry. v. Browning,* 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940).

We have previously cited *Browning* with approval, quoting the following:

This court [United States Supreme Court] has previously had occasion to advert to the narrow and sometimes cramping provisions of these state uniformity clauses, and has left no doubt that their inflexible re-

---

**2.** The reference is to §§ 42–701 *et seq.*

strictions upon the taxing powers of the state were not to be insinuated into ... the Equal Protection Clause....

*Apache County v. Atchison, Topeka & Santa Fe Ry. Co.*, 106 Ariz. 356, 359, 476 P.2d 657, 660 (1970) (quoting *Browning*, 310 U.S. at 368, 60 S.Ct. at 971). Although we do not necessarily agree that the provisions of art. 9, § 1 of our state constitution are narrow or cramping, or their restrictions inflexible, we have acknowledged that they are not a counterpart of but more restrictive than the equal protection clause. *Id.* They were intended for a different purpose: to ensure "that each taxpayer's property bear the just proportion of the property tax burden." *Merris v. Ada County*, 100 Idaho 59, 63, 593 P.2d 394, 398 (1979);[3] *see also Apache County*, 106 Ariz. at 361, 476 P.2d at 661; *Yellowstone Pipe Line Co. v. State Board of Equalization*, 138 Mont. 603, 358 P.2d.55, 64 (1960) (The tax uniformity rule imposes government's burdens on "property in proportion to its use, its productivity, its utility [and] its general setting in the economic organization of society.").

▮ This is not to say that all property must be taxed at the same rate. The constitution obviously permits property division into classes to be taxed at different rates. Thus, we have always recognized the legislature's power to classify. *People's Finance & Thrift Co. v. Pima County*, 44 Ariz. 440, 445, 38 P.2d 643, 645 (1934). Although we affirm and respect the legislature's "broad discretion in the matter of classifying property," we have also long held that the legislature may not unfairly and unreasonably discriminate "between taxpayers of the same class, or be arbitrary, specious, or fanciful." *Id.* at 445–46, 38 P.2d at 645. Thus, a tax classification must "rest upon real differences and be reasonable." *Id.* at 446, 38 P.2d at 645. This means that property of the same character must be taxed the same, *Southern Pacific Co. v. Cochise County*, 92 Ariz. 395, 400, 377 P.2d 770, 774 (1963), and makes our constitution's tax uniformity clause a guarantee of "[e]quality of opportunity [for] all persons and corporations similarly situated."

*Stults Eagle Drug Co. v. Luke*, 48 Ariz. 467, 476, 62 P.2d 1126, 1130 (1936); *J.C. Penney Co. v. Department of Revenue*, 125 Ariz. 469, 472, 125 Ariz. 469, 610 P.2d 471, 474 (Ct.App. 1980) (classes must be reasonable and not arbitrary).

Other jurisdictions with similar constitutional clauses have reached similar conclusions. Under a uniformity clause, property cannot be put in different classes "according to size or location rather than value because this would be arbitrary classification." *Gillis v. Yount*, 748 S.W.2d 357, 363 (Ky.1988); *State v. Minnesota Farmers Mut. Ins. Co.*, 145 Minn. 231, 176 N.W. 756, 757 (1920); *Mathias v. Department of Revenue*, 312 Or. 50, 817 P.2d 272, 278 (1991) ("Classifications, to pass state constitutional muster, must be based on inherent, qualitative, genuine, rational differences between the classes of property to be accorded different treatment.").

Two early Arizona cases set limits on legislative discretion that are still relevant today. In fact, in many aspects, the case at bar parallels *Smith v. Mahoney*, in which the Arizona Legislature sought to foster Arizona's livestock industry by imposing on nonresident stock owners a tax for each goat, sheep, steer, or horse grazed or pastured within Arizona, although resident owners paid no such tax. The court held the tax "wanting in uniformity" and "unequal as applied to the same class of property." 22 Ariz. 342, 350, 197 P. 704, 707 (1921). "This palpable discrimination" between residents and non-residents "robs the law of the indispensable requisite that taxes be uniform upon the same class of property within the jurisdiction of the body imposing them." *Id.* at 351, 197 P. at 707.

In *State Tax Commission v. Shattuck*, this court similarly held that the legislature could not make tax distinctions within the same class of intangible property. Where the attempted classification was "more fanciful than real," it could not be upheld, even if the resulting tax penalty was small. 44 Ariz. 379, 401, 38 P.2d 631, 640 (1934). The court pointedly asked: "Can discrimination be al-

---

**3.** The Idaho Constitution is quite similar to Arizona's in relevant part. *See* Idaho Const. art. 7,

§ 5: "taxes to be uniform—all taxes shall be uniform upon the same class of subjects...."

lowed as between property in the same class? If permitted where the discrimination is slight, when shall it be denied?" *Id.*

Under these decisions, it seems apparent that the tax statutes at issue here violate the uniformity clause because they effectively tax America West's commuter airplanes at a higher rate than commuter aircraft used by any other airline for the same purpose. The sole basis for the discrimination is the number and size of the other airplanes in America West's fleet. Because of its other airplanes, America West's commuter airplanes, flying commuter routes to rural Arizona, are taxed at a higher rate than the airplanes of its commuter competitors, whose fleets are small enough to qualify for the tax rate limit of § 42-705(C). The only reason advanced for this unequal treatment is that a tax break for small airlines may encourage the use of commuter equipment to serve Arizona cities and towns that would otherwise lack any air service. Although this may be a good and valid reason, it is certainly not a *property* classification. We deal here only with the latter.

A property classification statute arguably might, for instance, tax small airplanes differently from large ones or airplanes used for rural service differently from those flying urban routes. The classification thus made would be a classification of property—based on one of the property's characteristics or uses—rather than a classification of owners.

## C. Making sense of more recent precedent

It appears, therefore, that the discrimination caused by the statutes in question falls under the rationale of *Mahoney* (1921) and *Shattuck* (1934). The Department, however, argues that recent authority supports its position. The patina of legislative acts and imprecise judicial language since *Mahoney* and *Shattuck* indeed may have obscured art. 9, § 1's protections. We have held that the legislature may divide similar property into different classes. *Apache County,* 106 Ariz. at 360, 476 P.2d at 661. Still, we have always insisted that there be a rational, discernable basis for the distinctions. *Id.* at 361–62, 476

P.2d at 662–63; *People's Finance,* 44 Ariz. at 445–46, 38 P.2d at 645.

In *Apache County,* we held that property used in the railroad industry could be classified separately from similar property used in other industries, noting that a class "may be the grouping together of ... things for a common purpose or it may be a ranking of ... things possessing the same attributes." 106 Ariz. at 359, 476 P.2d at 660. Assuming that the constitution's uniformity clause permits either categorization of property for purposes of ad valorem taxation, the Department's suggested distinctions in this case fit neither. These aircraft, whether owned by America West or other airlines, have the same physical attributes and are used in the same industry for the same purpose. By any rational standard, they appear to belong to one class and must, therefore, be taxed uniformly to give effect to art. 9, § 1.

It is true that we have upheld rather finely spun classifications even though the uses were generally similar, as long as there was a dividing line. *See, e.g., Department of Revenue v. Trico Electric Co-op, Inc.,* 151 Ariz. 544, 549, 729 P.2d 898, 903 (1986) (property of electric and gas distribution utilities could be separately classed and taxed differently from property of water and gas pipeline utilities). *Trico*'s result was based on our decision in *Apache County* that the legislature has the discretion to "impose the burdens of government on property in proportion to use, productivity and utility" of the property. 106 Ariz. at 361, 476 P.2d at 662. In *Apache County,* as in *Trico,* however, the basis for recognizing a separate class was the difference in the nature of the industries in which the property was put to use. *Id.* at 360–61, 476 P.2d at 661–62; *Trico,* 151 Ariz. at 548–49, 729 P.2d at 902–03. The present taxing scheme, however, far surpasses any Arizona precedent.

Although *Apache County* and *Trico* may allow the legislature to place airline company property—a Ford truck, for instance—in one tax class, put identical railroad company property—the same Ford truck—in another, and tax them at different rates, we deal here with a statute creating different tax rates for property with similar physical attributes and

productiveness, used the same way and for the same purpose by owners in the same industry.[4]  If the uniformity requirement of the constitution has any meaning—and it must—this goes too far.  *See Minnesota Farmers*, 176 N.W. at 757 (Differences between classes "must not be so wanting in substance that the classification results in permitting one to escape a burden imposed on another under substantially similar circumstances and conditions.").  In fact, our own *Mahoney* and *Shattuck* opinions would flatly forbid this result.  However, we have never before been asked to review or approve a classification based on the size or value of an owner's *other* property.

## D.  Validity of classifications based on size or value of an owner's other holdings

Courts in other states with tax uniformity clauses in their constitutions have reached conclusions similar to *Mahoney* and *Shattuck*.  For example, in *Mathias*, the state argued that valid legislative goals supported a classification giving a lower tax rate to owners of four or more lots within one residential subdivision.  The state valued such property below market to "encourage investment and effort by those engaged in subdividing land [and] to stimulate subdividers into more activity than market forces alone would produce."  817 P.2d at 280.

The Oregon Supreme Court sympathized with this goal, but still found *"no difference in kind or in use of the property* on which to base a selective exemption."  *Id.* 817 P.2d at 281 (emphasis added).  Even if the exemption had a rational justification (as, we assume, does the limit in the present case), it would not "override the constitutional requirement for uniformity in [the property tax] context."  *Id.* 817 P.2d at 279.  Other-

wise the legislature could "render ineffective all uniformity of taxation constitutional protections."  *Id.*  Moreover, the court recognized that "the amount of *other property* that a taxpayer owns is not a rational basis for distinguishing between otherwise identical [property] for tax purposes."  *Id.* (emphasis added).  The court invalidated the legislature's classification scheme.  *See also In re Opinion of the Justices*, 84 N.H. 557, 149 A. 321, 326, 330 (1930).

In key aspects, the present case also resembles *American Stores Co. v. Boardman*, in which a Pennsylvania license tax increased solely according to the number of stores or theaters under the same general management.  Thus, operators of one store would pay a maximum license fee of only one dollar, while operators of five stores would pay one dollar for the first store and five dollars for *each* of the other four.  The scale went up, so that at the top of the statutory scale, those operating over 500 stores would pay a $500 license fee for *each* store over 500.  336 Pa. 36, 6 A.2d 826, 827 (1939).

The license tax classification was set up solely on "a difference in quantity of precisely the same" property in the *same industry*.  The Pennsylvania Supreme Court held the law void under Pa. Const. art. 9, § 1 ("[a]ll taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax").  *Id.* 6 A.2d at 828.  In the present case, as in *Boardman*, the statute penalizes America West for the number or value of its possessions (airplanes).  Thus, we have an ad valorem tax graduated, not by differences in the property or its use, but by differences in the nature of other property belonging to the owners, a distinction that, if approved, would seemingly read the uniformity clause out of the Arizona Constitution.[5]

---

4. Unlike *Trico*, we are not considering companies in the same general industry that provide different services to different customers (pipeline utilities versus direct distribution utilities).  *Trico*, 151 Ariz. at 548, 729 P.2d at 902.  Instead, we confront direct competitors using the same aircraft types to provide identical airline commuter services to the same customer base.  The dissent's fear that the present opinion will promote ill-considered determinations on what constitutes the relevant industry are unfounded.  As-

certaining the relevant industry is the start of the inquiry—not the end.  The court must *also* examine the property's physical attributes, productivity, use, and purpose.  If *all* factors are the same, the uniformity clause prevents differential classification.

5. Our framers were evidently aware and intended that the uniformity provision prevent graduated taxes on property, that is, taxes on identical property that varied depending on the wealth (or

### E. Deference to the legislature

As noted above, the Department argues that this case is easily solved by reading A.R.S. § 42–705(C) in conjunction with § 42–162(A)(7)(c), the classification statute, to find that the legislature intended to create two separate classes of flight property based on the systemwide average passenger or payload capacity of the airline company owning the property. There is some authority for judicial recognition of such implied classifications. *See Trico*, 151 Ariz. at 549, 729 P.2d at 903. We are not eager, of course, to find classifications that the legislature has not expressly created. *See Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994) ("[W]e are reluctant to interpret a statute in favor of ... preemption ... if there is any reasonable doubt about the legislature's intent.").

This is certainly as true when creating tax classifications as in recognizing preemptions.

Making classifications for taxation is, in the first instance, a political exercise. The "power to classify is legislative." *Apache County*, 106 Ariz. at 359, 476 P.2d at 660; *People's Finance*, 44 Ariz. at 445, 38 P.2d at 645. Thus, as to the creation of future classes for taxation purposes, we will not imply classifications that the legislature has not expressed.[6]

Even were we to agree with the Department's contention, however, and conclude that the legislature intended to make separate classifications in the present case, the argument misses the ultimate issue—and the first question on which we granted certification: whether the constitution permits the legislature to make the classification in question. With the greatest deference to the legislature, and agreeing with the Department that the legislature must have great leeway in taxation, the constitution's uniformity clause was obviously meant to restrict the legislature's power to tax. *Apache Coun-*

---

total property holdings) of the owner. They evidently intended to distinguish between *ad valorem* taxes—those taxes based on the value of property—which were to be uniform on all property in the same class, and graduated taxes, such as the income tax. The relevant debate on what would be art. 9, § 1 occurred on the morning of November 19, 1910. Arizona Supreme Court, THE RECORDS OF THE ARIZONA CONSTITUTIONAL CONVENTION OF 1910 464–68 (John S. Goff, ed. 1990).

Fred Ingraham (Dem., Yuma County) was concerned that art. 9, § 1 might prohibit the use of graduated income and inheritance taxes. *Id.* at 465. Everett E. Ellinwood (Dem., Cochise County) responded that "the very purpose" of the clause was to give the state or a city the power "to make classification as provided by law." *Id.* As Ellinwood saw it, "[w]hen the classification is made, then a tax may be laid on such classes as it sees fit." *Id.* That would allow different tax rates for different incomes. *Id.* Dissatisfied with that explanation, Ingraham replied:

> It does not seem to me that the ordinary meaning of the words will allow of the classification of incomes of $5,000, in one class, another class of $50,000, and that seems straining the meaning of the words.

*Id.*

Michael G. Cunniff (Dem., Yavapai County) agreed that Ingraham's point was "well taken," and proposed a clarifying amendment that "nothing in this section shall be construed as prohibiting the state to impose taxes on incomes graduated according to the amount of income." *Id.* at 466.

Convention President George W.P. Hunt (Dem., Gila County) opined that "[a] simple and

elastic constitutional provision [on taxation] ... leaves the needed discretion to the legislature and permits accommodation to the changing needs of growing communities." *Id.* Apparently satisfied at first that the language as written provided the needed flexibility, the delegates defeated the amendment that would have specified that the legislature could implement graduated income and inheritance taxes. *Id.* at 466–67.

Later, however, the delegates indicated their view of the uniformity clause and ended any lingering doubts on the subject by adopting a constitutional provision specifically authorizing the legislature to levy and collect graduated income, inheritance, and other taxes. Ariz. Const. art. 9, § 12. However, this later clause did not authorize graduated ad valorem taxes on personal or real property.

6. We note that in *Trico*, the words of the *classification statute itself* indicated a legislative intent to create separate classes. We concluded there that the uniformity clause did not require the legislature to engage in the superfluous act of making separate subparagraphs in the classification statute. Whatever the value of that methodology, it is, by its very nature, limited to *Trico*'s unique facts in interpreting the classification statute. In the present case, the Department asks us to find a legislative classification by combining the classification statute, which mentions only a single class—flight property—with the statute imposing different tax rates on that property. That methodology, in essence, would compel us to conclude that because the legislature did not intend to violate the constitution, it did not do so.

*ty,* 106 Ariz. at 359, 476 P.2d at 660. If there is no restriction on the power to classify, there is no restriction on the power to tax, and the constitution's uniformity clause would have no meaning. This is a result we cannot condone. Under our constitution, the power to classify and impose differing taxation rates is legislative, but the responsibility to enforce the constitution's limits is judicial.

We conclude, therefore, that the classification the Department claims was made in the present case by § 42–705(C) violates the uniformity clause of art. 9, § 1, insofar as it creates unequal ad valorem tax rates for property with the same physical characteristics, used in the same industry for similar purposes.

In reaching this conclusion, we merely follow our line of cases from the early days of statehood, that classifications for taxation purposes must be real, not fanciful, and based on the nature of the property or on some other real difference in its use, utility, or productivity. We neither overrule nor disapprove *Apache County* and *Trico,* in which we upheld classifications based on differences between the industries in which the property was employed and the uses to which the property was put.[7] Thus, identical or similar property put to different uses or used for the same purpose in different industries may be put in different classifications. However, similar property used in the same industry for the same purpose cannot be classified differently for ad valorem taxation simply because of the size, wealth, or location of its owner.

Probably the framers would have preferred a less elastic uniformity clause, but we do not now write on a clean slate. In *Apache County* and *Trico,* we expanded the limits of the uniformity clause, but, to quote the song, we have "gone about as fer as [we] can go." In this case, we conclude that we can go no further without writing the uniformity clause out of the constitution.

**CONCLUSION**

We therefore answer the first certified question as follows: A.R.S. §§ 42–162, 42–705(A), and 42–705(C), as applied in this case, create a system of taxation that violates the uniformity clause of Ariz. Const. art. 9, § 1. This conclusion, of course, moots the other certified questions, making it unnecessary to answer them. We do not speculate on what practical relief, if any, may result from this conclusion. That question was not presented to us and is therefore left to the bankruptcy judge.

ZLAKET and MARTONE, JJ., concur.

CORCORAN, Justice, dissenting.

I respectfully dissent. In holding that the classification created by A.R.S. § 42–705(C) violates the uniformity clause, the majority departs from long-standing rationale adopted by this court in both *Apache County* and *Trico.* Those cases clearly indicate that the uniformity clause places no restrictions on the way in which the legislature initially classifies property for the purposes of taxation. As this court stated in *Apache County:*

> [Article 9, § 1] does not itself classify property nor does it purport to embrace a scheme for the classification of property. The power to classify is legislative . . . .

*Apache County,* 106 Ariz. at 359, 476 P.2d at 660. This court has further stated that "[t]he *only* restraint placed upon the legislature by this provision is that when property has once been classified the rate must be uniform upon all property of the same class." *Apache County,* 106 Ariz. at 359, 476 P.2d at 660 (emphasis added); *accord Trico,* 151 Ariz. at 548, 729 P.2d at 902. Assuming—as does the majority—that the legislature intended to divide "flight property" into two separate subclasses, the plain language of both *Apache County* and *Trico* demonstrates

---

**7.** In *Apache County,* the legislature "classified all the real and personal property of railroad companies used in the continuous operation of a railroad separately from all other properties in Arizona." 106 Ariz. at 360, 476 P.2d at 661. In *Trico,* the classification was between property belonging to "electric and gas distribution utili-ties" and property of "water and gas pipeline utilities." 151 Ariz. at 548, 729 P.2d at 902. In *Apache County,* the industries owning and using the property were distinctly different. Presumably the same was true in *Trico;* at least Trico did not argue to the contrary. Here, we deal with competitors in the same industry.

536

that the uniformity clause does not prevent it from doing so.

In an attempt to distinguish *Apache County* and *Trico* from this case, however, the majority maintains that the basis for upholding the classification schemes at issue in those cases was "the difference in the nature of the industries in which the property was put to use." Although the difference between the relevant industries in *Apache County* is readily apparent, the same cannot be said of *Trico.* In *Trico,* this court upheld a classification scheme that placed the property of electric and gas distribution utilities in a class different from the property of water and gas pipeline utilities. 151 Ariz. at 548, 729 P.2d at 902. One could plausibly argue that the property of each type of utility company was indeed used by owners in the same industry—i.e., the utility industry.

In my view, any attempt to distinguish this case from *Apache County* and *Trico* fails. The relevant difference, if any, between the two types of utility companies in *Trico* appears to be a disparity in the *type of business* operated by each property owner. The same is true in this case—i.e., "small" airlines differ from "large" airlines such as America West in that they provide only statewide or local air transportation rather than full service air transportation.

The "standard" announced by the majority today will only foster unprincipled, *ad hoc* determinations by this court as to what constitutes the "relevant industry" for purposes of analysis under the uniformity clause. As such, the opinion does not clarify the limitation, if any, that the uniformity clause places upon the legislature's power to classify property for purposes of taxation.

MOELLER, Vice Chief Justice, concurring.

I concur in Justice Corcoran's dissent.