985 P.2d 564

Sandy BAHR, Plaintiff–Appellant,

v.

STATE of Arizona, Defendant–Appellee,

and

Intel Corporation, Intervenor–Appellee.

No. 1 CA–CV 97–0580.

Court of Appeals of Arizona,
Division 1, Department B.

Jan. 19, 1999.

As Amended Jan. 20 and March 3, 1999.

Review Denied Sept. 21, 1999.

Arizona Center for Law in the Public Interest by Timothy M. Hogan and Jennifer B. Anderson, Phoenix, Attorneys for Plaintiff–Appellant.

Grant Woods, The Attorney General by Michael F. Kempner, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee.

Brown & Bain, P.A. by Paul F. Eckstein, Lynne C. Adams and John J. Tuchi and Cruse, Firetag & Bock, P.C. by Jules I. Firetag, Phoenix, Attorneys for Intervenor–Appellee.

OPINION

THOMPSON, Presiding Judge.

¶ 1 Sandy Bahr (Bahr), represented by the Arizona Center for Law in the Public Interest, appeals from a summary judgment entered for appellees State of Arizona and intervenor Intel Corporation (Intel) in Bahr's suit for declaratory and injunctive relief. The trial court rejected Bahr's contention that a subdivision of the "class eight" property classification established by Ariz.Rev.Stat. Ann. (A.R.S.) § 42–162(A)(8) (Supp.1997) for ad valorem tax purposes violates the Uniformity Clause of the Arizona Constitution, Ariz. Const. Art. 9, § 1. We must decide whether the commercial/industrial properties that qualify for assessment under this subdivision are rationally distinguishable, based on legitimate differences in their physical or legal characteristics, the industries in which they are deployed, or their use, utility, purpose, or productivity, from other commercial/industrial properties that must be assessed instead under the costlier class three. A.R.S. § 42–162(A)(3). *See generally In re America West Airlines, Inc.,* 179 Ariz. 528, 530–32, 880 P.2d 1074, 1076–78 (1994); *Cutter Aviation, Inc. v. Arizona Dep't of Revenue,* 191 Ariz. 485, 958 P.2d 1 (App.1997), *review denied,* June 25, 1998.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The initial clause of the second sentence of Ariz. Const. Art. 9, § 1, called the Uniformity Clause, provides:

All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax....

¶ 3 Through A.R.S. § 42–162(A) (Supp. 1997), the Arizona legislature has established eleven distinct classes of property for ad valorem taxation purposes. This case concerns two of them. Class three consists of all real property, improvements, and personal property "devoted to any commercial or industrial use other than property included in class one, two, four, six, seven, eight, nine or ten." A.R.S. § 42–162(A)(3)(a) and (b). Class eight includes as subclassification (b) "[a]ny real and personal property located within the boundaries of a foreign trade zone [FTZ] or subzone...."[1] A.R.S. § 42–162(A)(8)(b).

¶ 4 In Arizona, ad valorem tax liability is determined by applying the taxing entity's tax rate to the "assessed valuation" of the property subject to taxation. "Assessed valuation" is determined as a prescribed percentage of the property's "full cash value." *See* A.R.S. §§ 42–201, 42–227. Class eight property is assessed at 5% of its full cash value, as is class five (owner-occupied residential property). Class three property is assessed at 25% of its full cash value. A.R.S. § 42–227(A)(3), (5), (8). Accordingly, the ad valorem tax imposed on a given item of taxable property included in class three commercial/industrial will always be five times higher than if it were included in class eight FTZ.

¶ 5 The United States Foreign Trade Zones Board's report to Congress for the fiscal year ended September 30, 1995, provides an overview of the nature and function of foreign trade zones:

Foreign-trade zones are secure areas under U.S. Customs supervision that are considered outside the Customs territory of the United States upon activation under the regulations of the U.S. Customs Ser-

vice. Located in or near U.S. Customs ports of entry, they are the U.S. version of what are known internationally as free trade zones....

Foreign and domestic merchandise may be moved into zones for operations not otherwise prohibited by law involving storage, exhibition, assembly, manufacturing, and processing. All zone activity, especially manufacturing, is subject to public interest review. Under zone procedures the usual formal Customs entry procedure and payment of duties is not required on the foreign merchandise unless and until it enters Customs territory for domestic consumption, in which case the importer normally has a choice of paying duties either on the original foreign materials or the finished product. Domestic goods moved into a zone for export are considered exported upon entering the zone for purposes of excise tax rebates and drawback.

Zones are sponsored by qualified public or public-type corporations, which may themselves operate the facilities or contract for their operations with public or private firms. The operations are conducted on a public utility basis, with published rates. A typical general-purpose zone provides leasable storage/distribution space to users in general warehouse type buildings with access to all modes of transportation. Most zone projects include an industrial park site with lots on which zone users can construct their own facilities. Subzones are usually private plant sites authorized by the Board through zone grantees that cannot be accommodated within an existing general-purpose zone.

¶ 6 The United States Congress enacted the Foreign Trade Zone Act in 1934 with the purpose of

... expedit[ing] and encourag[ing] foreign commerce.... The statute effectively permits the storage, exhibition, sale and general dealing respecting foreign commerce without subjecting same to the customs laws of the United States.

*Fountain v. New Orleans Pub. Serv.,* 387 F.2d 343, 344 (5th Cir.1967). The Act

---

1. Hereinafter "class eight FTZ property."

"aim[ed] to foster the dealing in foreign goods that are imported, not for domestic consumption, but for reexport to foreign markets and for conditioning, or for combining with domestic products previous to export." S.Rep. No. 905, 73rd Cong., 2d Sess. 4 (1934).

¶ 7 The objectives of foreign trade zones expanded in 1950 and 1952. In 1950 Congress created the United States Foreign Trade Zones Board (FTZ Board) and vested it with power to decide where FTZs would be located and who would operate them. At the same time, Congress newly authorized full-scale manufacturing in FTZs in addition to the repackaging and reprocessing to which FTZ activities were formerly limited. 19 U.S.C. § 81c(a). In 1952 the FTZ Board began to permit FTZ grantees to create special purpose foreign trade zones (subzones) for individual company sites. 15 C.F.R. §§ 400.11(a)(2), 400.21(b); 19 C.F.R. § 146.1(b)(17). Business operations in a subzone are subject to most of the same customs regulations and receive the same benefits as those in a general purpose FTZ. 15 C.F.R. §§ 400.2(n), (q), 400.23; 19 C.F.R. § 146.1(b)(17); 19 U.S.C. § 81c(e)(4).

¶ 8 An application for a zone project must describe the relationship of the proposed project to the community's and the state's overall economic development plans and objectives. 15 C.F.R. § 400.24(c)(5) and (d)(4). In passing on a zone project application, the FTZ Board must consider the need for zone services, the adequacy of operational and financial plans, the extent of state and local government support for formation of the zone, and the views of persons and enterprises likely to be affected. 15 C.F.R. § 400.23.

¶ 9 Once authorized by the FTZ Board, an FTZ or subzone must be "activated" before it may begin operation.[2] To do so the FTZ or subzone operator must secure the approval of the "port director," usually the director of United States Customs for the customs jurisdictional area in which the zone is located. 15 C.F.R. § 400.2(h). The operator must also execute an FTZ operator's bond. 19 C.F.R. § 146.6.

¶ 10 The FTZ Board granted the City of Phoenix the right to establish a general purpose FTZ in 1982. The city's FTZ is now located at Phoenix Sky Harbor International Airport. Four other general purpose FTZs also exist in Arizona.

¶ 11 Before 1991 the City of Phoenix created no subzones. Effective September 21, 1991, the Arizona legislature added a new subdivision of class eight property. 1991 Ariz. Sess. Laws Ch. 305, § 1. New A.R.S. § 42–162(A)(8)(b) now included in class eight:

Any real and personal property located within the boundaries of a foreign trade zone or subzone established pursuant to 19 United States Code section 81 and title 44, chapter 18. The property classification authorized by this subdivision shall apply only to the area of a foreign trade zone or subzone which has been activated for foreign trade zone use by the district director of the United States customs service, pursuant to section 146.6 of the United States customs service, pursuant to 19 Code of Federal Regulations § 146.6.

¶ 12 Beginning on May 3, 1991, and continuing through December 16, 1996, the FTZ Board approved six City of Phoenix subzone applications: the Conair Corporation manufacturing plant in Glendale (1991), the Wal–Mart distribution/processing facility in Buckeye (1993), intervenor-appellee Intel Corporation's semiconductor/ integrated circuit and data processing products manufacturing facility in Chandler (1994), the SGS–Thompson Microelectronics, Inc., semiconductor manufacturing plant in Phoenix (1995), Abbot Mfg., Inc.'s infant formula and adult nutritional products manufacturing plant in Casa Grande (1996), and PetsMart, Inc.'s warehouse/distribution facility in Phoenix (1996).

¶ 13 In January 1997, Sandy Bahr, a Maricopa County property owner and taxpayer, brought this action against the state seeking injunctive relief against the applica-

---

**2.** 15 C.F.R. § 400.1(c) provides in part:

To the extent activated under Customs procedures in 19 CFR part 146, and only for the purposes specified in the Act (19 U.S.C. 81c), zones are treated for purposes of the tariff laws and Customs entry procedures as being outside the Customs territory of the United States.

tion of A.R.S. § 42–162(A)(8)(b) and a declaration that the statute violated Arizona's Uniformity Clause. Intel intervened by stipulation as a party defendant.

¶ 14 Bahr moved for summary judgment. The state and Intel responded and cross-moved for summary judgment. The trial court granted summary judgment for the state and Intel. Its minute entry ruling explained in part:

> ... [I]t is well settled that the Legislature may divide similar property into different classes as long as there is a rational, discernible basis for the distinctions. *Apache County v. Atchison, Topeka & Santa Fe Ry. Co.,* 106 Ariz. 356, 476 P.2d 657 (1970), *app. dismissed sub nom. Atchison, Topeka & Santa Fe Ry. Co. v. Apache County,* 401 U.S. 1005, 91 S.Ct. 1257, 28 L.Ed.2d 542 (1971). The question presented here is whether, for ad valorem tax purposes, the different treatment of property located within the boundaries of an FTZ is based on a reasonable distinction in the property's characteristics or uses.
>
> . . . .
>
> The Court finds that there is a rational and discernable [sic] basis for the distinctions. A.R.S. § 42–162(A)(8)(b) provides a different rate for the taxation of property in an FTZ based on the nature of the property, its use, productivity, utility and the difference [sic] to which the property is put to use.
>
> . . . .
>
> This is not a matter (as Bahr asserts) "of identical property used for the same purpose within the same industry, distinguished only by location in a foreign trade zone." Property subject to "Class 8" treatment must meet the rigorous requirements of the Foreign Trade Zones Act and only those properties with sufficient importing and exporting activities can meet all the criteria.
>
> Briefly, to qualify, the FTZ property must be used as a warehouse transshipment site or a manufacturing plant which

imports foreign materials for processing into a finished product for export or for domestic consumption. Consequently, the nature, use, and utility of the property is different from other commercial property which is not involved in international trade and which does not have to comply with the Board's and U.S. Customs' rigorous requirements through regulations and inspections.

> In addition, throughout the period of the subzone designation, the business must continue to meet these requirements and subject itself to the continued scrutiny of the U.S. Custom[ ]s service. For example, businesses that operate within an FTZ are subject to strict inventory control, record-keeping and reporting requirements, and mandates regarding lighting and security systems (down to key and lock controls). Failure to comply with the laws and regulations relating to foreign-trade zones can result in the forfeiture of the goods and even subject the zone grantees to criminal sanctions with jail sentences.

¶ 15 Bahr timely appealed. We have jurisdiction under A.R.S. § 12–2101(B).

## DISCUSSION

### A. GOVERNING ARIZONA CASE LAW

¶ 16 This appeal requires us to determine whether the criteria distinguishing class eight FTZ property from other commercial or industrial property pass muster under the Uniformity Clause. The Arizona legal principles that govern that inquiry have evolved over the past several decades somewhat erratically.

¶ 17 The first Uniformity Clause decision to test a provision of Arizona's modern property tax classification and assessment system, adopted in 1967, was *Apache County v. Atchison, Topeka & Santa Fe Ry. Co.,* 106 Ariz. 356, 476 P.2d 657 (1970). In that case the legislature's system assessed "class one" property at 60% of full cash value. *Id.* at 357–58, 476 P.2d at 658–59. Included in class one under former A.R.S. § 42–136(1)(c) [3] was "[a]ll real and personal prop-

---

3. Former A.R.S. § 42–136 was renumbered as § 42–162 by 1985 Ariz. Sess. Laws Ch. 366, § 11.

erty of railroad companies used in the continuous operation of a railroad valued under the provisions of §§ 42–761 through 42–766." The taxpayer-railroads challenged this subdivision of class one as contrary to the Uniformity Clause. In the superior court they prevailed. On review by our supreme court, they did not.

¶ 18 The supreme court observed that the Uniformity Clause neither classified property nor embraced a property classification scheme. The court stated:

> ... The power to classify is legislative.... It is a power inherent in the state ..., and the state may exercise a wide discretion in selecting the subjects of taxation.... *The only restraint placed upon the legislature by this provision is that when property has once been classified the rate must be uniform upon all property of the same class ....*

106 Ariz. at 359, 476 P.2d at 660 (citations omitted; emphasis added).

¶ 19 The *Apache County* court stated that a "class" may be either a grouping of persons or things for a common purpose, or a ranking of persons or things that have the same attributes. *Id.* It stated further that the legislature had used "class" in the first sense in classifying property for tax purposes, but that in the Uniformity Clause the term "class" had "obviously" been used in the second sense. *Id.* The court nevertheless held implicitly that the legislature was entirely free to create classifications defined either by common purpose or by common attributes. Because this was a legislative function, the superior court was not free to place the taxpayers' property in a different classification at a lower assessment rate. *Id.* at 359–60, 476 P.2d at 660–61.[4]

¶ 20 In *Arizona Dep't of Revenue v. Trico Electric Cooperative, Inc.,* 151 Ariz. 544,

729 P.2d 898 (1986), our supreme court applied *Apache County's* view that the Uniformity Clause only minimally restrains the legislature's classification power. Before 1980, electric and gas distribution plants and water and gas pipeline utilities were classified together as class two property and valued according to the traditional "standard appraisal methods and techniques." *See generally* A.R.S. § 42–141(A)(7). In 1980 the legislature amended A.R.S. § 42–124.01 to provide that electric and gas distribution plants would now be valued at original plant in service cost less accumulated depreciation—plainly a more favorable valuation formula than allowed under standard appraisal methods from the taxpayer's point of view.[5] Property of water and gas pipeline utilities continued to be valued according to standard appraisal methods and techniques.

¶ 21 In discussing the disparate impact of the new valuation formula on electric cooperatives as compared to investor-owned electric utilities, the *Trico Electric* court restated *Apache County's* holding that "[t]he only restraint placed upon the legislature by [the Uniformity Clause] is that when property has once been classified *the rate must be uniform* upon all property of the same class." *Id.* at 548, 729 P.2d at 902 (emphasis added by *Trico Electric* court). The court then addressed *Trico Electric's* Uniformity Clause challenge as follows:

> ... Trico argues that because gas, electric, water, and pipeline utility property have been classified together, full cash values of such property must be calculated using identical formulae rather than using both statutory formulae and standard appraisal methods.
>
> Despite express statutory language suggesting otherwise, we believe that § 42–136(A)(2)(b) creates not one but two prop-

---

4. The *Apache County* court stated:

   The railroads urge that real property is itself a class and that personal property having the same characteristics, such as tractors and radios, are each a class which under Article IX, § 1 must be uniformly taxed. But the classifications of property as advanced by the railroads are not the classifications which the Arizona Legislature has chosen. The Legislature, by § 42–136 has classified all the real and person-

al property of railroad companies used in the continuous operation of a railroad separately from all other properties in Arizona.
   *Id.*

5. The legislature simultaneously amended A.R.S. § 42–201(4) to provide that "full cash value" or "market value" could now be calculated either using standard appraisal methods and techniques "or as provided by law."

erty classes. The legislature amended § 42–124.01 to value electric and gas distribution utilities differently from water and gas pipeline utilities. The simultaneous amendment of § 42–136(A)(2)(b) indicates legislative intent to harmonize the classification statute with the valuation statute and create two separate classes of utility property. Any other interpretation would render the amendment to § 42–136(A)(2)(b) meaningless.

... Interpreting § 42–136(A)(2)(b) to create two utility property classes renders the statute constitutional because tax rates and formulae used to calculate tax bases are uniform within each of the two classes.

*Id.* at 548–49, 729 P.2d at 902–03. The *Trico Electric* majority did not address the question whether any rational distinction existed between electric and gas distribution plants on the one hand and water and gas pipeline utilities on the other.

¶ 22 Our supreme court discussed and developed that issue in its next Uniformity Clause case, *In re America West Airlines, Inc.*, 179 Ariz. 528, 880 P.2d 1074 (1994). There, in a Chapter 11 proceeding in the United States Bankruptcy Court, debtor America West Airlines challenged the "flight property" classification in A.R.S. § 42–162(7)(c) as invalid under the Uniformity Clause. *Id.* at 528–30, 880 P.2d 1074–76. The district court certified that question to our supreme court.

¶ 23 The court held the flight property classification as applied to America West invalid under the Uniformity Clause. *Id.* at 528, 880 P.2d at 1074. It observed that A.R.S. § 42–162(7)(c) applied two dissimilar valuation formulae to flight property. *Id.* at 530, 880 P.2d at 1076. Which of the two applied to any given item of flight property depended on the general characteristics of

other property that belonged to its owner. *Id.*

¶ 24 Following *Trico Electric*, the court determined that by applying two different valuation formulae to flight property, the legislature had effectively created two classifications of property. *Id.* at 532–35, 880 P.2d at 1078–81. In contrast to its approach in *Trico Electric*, however, the court went on to hold that the flight property in these two classifications was the same or similar in nature, use, industry of deployment, utility, productivity, and purpose. *Id.* at 535, 880 P.2d at 1081. Because some flight property was taxed at different rates than other flight property, the court held that the disparate valuation formulae incorporated by A.R.S. § 42–162(7)(c) contravened the Uniformity Clause. *Id.*

¶ 25 The court acknowledged that *Trico Electric* had sustained a "finely spun" classification based on *Apache County*. Though it declined to overrule *Apache County* or *Trico Electric*, the court nevertheless stated that if the uniformity requirement were to have any meaning at all, it had to invalidate "a statute creating different tax rates for property with similar physical attributes and productiveness, used the same way and for the same purpose by owners in the same industry." *Id.* at 532–33, 880 P.2d at 1078–79.

¶ 26 The court characterized *Apache County* and *Trico Electric* as merely authorizing the legislature to separately classify and differentially tax identical property used in different industries.[6] The court stated:

Unlike *Trico*, we are not considering companies in the same general industry that provide different services to different customers (pipeline utilities versus direct distribution utilities). *Trico*, 151 Ariz. at 548, 729 P.2d at 902. Instead, we confront direct competitors using the same aircraft types to provide identical airline commuter

---

**6.** In its footnote 7, the court explained:

In *Apache County*, the legislature "classified all the real and personal property of railroad companies used in the continuous operation of a railroad separately from all other properties in Arizona." 106 Ariz. at 360, 476 P.2d at 661. In *Trico*, the classification was between property belonging to "electric and gas distribution utilities" and property of "water and gas pipe-

line utilities." 151 Ariz. at 548, 729 P.2d at 902. In *Apache County*, the industries owning and using the property were distinctly different. Presumably the same was true in *Trico*; at least Trico did not argue to the contrary. Here, we deal with competitors in the same industry.

*Id.* at 535, 880 P.2d at 1081.

services to the same customer base. The dissent's fear that the present opinion will promote ill-considered determinations on what constitutes the relevant industry are unfounded. Ascertaining the relevant industry is the start of the inquiry—not the end. The court must *also* examine the property's physical attributes, productivity, use, and purpose. If *all* factors are the same, the uniformity clause prevents differential classification.

*Id.* at 533 n. 4, 880 P.2d at 1079 n. 4 (emphasis in original).

¶ 27 The court concluded:

... Thus, identical or similar property put to different uses or used for the same purpose in different industries may be put in different classifications. However, similar property used in the same industry for the same purpose cannot be classified differently for ad valorem taxation simply because of the size, wealth, or location of its owner.

*Id.* at 535, 880 P.2d at 1081.

¶ 28 Most recently, in *Cutter Aviation, Inc. v. Arizona Dep't of Revenue,* 191 Ariz. 485, 958 P.2d 1 (App.1997) *review denied,* June 25, 1998, this court had occasion to apply the principles articulated in *America West.* In *Cutter Aviation* the question was whether a privately-owned long-term leasehold interest in public property, used for commercial purposes, could be taxed at a lower rate than commercial-use property held in fee simple absolute. *Id.* at 489–90, 958 P.2d at 5–6. This court interpreted *America West* to hold that permissible classification based on the "nature" of property extended not only to differences in physical attributes, but also differences in legal characteristics. *Id.* at 494–96, 958 P.2d at 10–12. We stated:

The form of ownership interest in property may be a critical element of the nature of that property. A fee simple interest is qualitatively very different from a possessory right. Fee simple ownership allows the unlimited use of the property subject only to statutory and common law restraints. A possessory interest, on the other hand, is generally limited in its use, utility and productivity, and, as in the in-

stant cases, may not be freely alienable. We therefore conclude that this distinction was a valid basis for differing ad valorem property tax treatment.

*Id.* at 496, 958 P.2d at 12.

## B. BAHR'S CONTENTIONS

¶ 29 Bahr characterizes the trial court's ruling for the state and Intel as having been founded on the involvement of class eight FTZ property in foreign trade, and on the subjection of such property to extensive federal regulations and inspections that do not apply to other commercial or industrial property. Relying primarily on *America West,* Bahr urges that FTZ property is not sufficiently distinct in nature or use from class three commercial/ industrial property to permit it to be assessed and taxed at a different rate.

¶ 30 Bahr argues that because companies without class eight FTZ property also participate in foreign trade, the criterion of foreign trade involvement fails to justify taxing class eight FTZ property at a different rate from that applicable to all other commercial or industrial property. She supports this view with the observation that Arizona law provides no standards against which the state and municipalities must evaluate FTZ or subzone applications. Bahr also points out that nothing in the federal FTZ statutes or the rules of the FTZ Board requires any minimum level of foreign trade participation for FTZ eligibility.

¶ 31 Bahr additionally argues that the subjection of FTZ activities to federal regulation fails to distinguish property used in those activities from other commercial property in any respects that are material to Uniformity Clause analysis. She urges that if every difference in the degree of government regulatory activity that applied to particular businesses were held to justify a separate property tax classification, Arizona's Uniformity Clause would be rendered "truly meaningless."

¶ 32 Bahr also contends that neither of the rationales she infers from the trial court's ruling has "anything to do with the nature or productivity of the property itself." She

urges that class eight FTZ classification results not from any differences in the nature or use of the property, but rather from implementation of "an economic development tool for the State of Arizona ..." at the taxpayer's request. She states: "While economic development may be a laudable goal, it is not an appropriate basis for differential tax treatment."

¶ 33 Bahr argues that none of the governing Arizona case law on which the state relies can square the class eight FTZ classification with the Uniformity Clause. She distinguishes *Apache County* and *Trico Electric* in that both cases hold that property used in different industries may be grouped in different property tax classifications. She argues, citing *America West,* that the class eight FTZ classification results in a different tax rate "for property with identical physical attributes and productiveness, used the same way and for the same purpose by owners in the same industry." 179 Ariz. at 532–33, 880 P.2d at 1078–79.

¶ 34 In the trial court Bahr also contended that the class eight FTZ classification was invalid under the Uniformity Clause because it classified based on the property's location in an activated FTZ. She argues that the plain language of A.R.S. § 42–162(A)(8)(b) impermissibly makes class eight FTZ classification depend not on the use of property in the operation of an FTZ but the "location" of property within the "area" of an activated FTZ.

¶ 35 Bahr also asserts that Congress or the FTZ Board could change or even eliminate the statutes or regulations governing the requirements for designation and activation of FTZs, but mere "location" within an FTZ would still be sufficient for class eight FTZ classification under A.R.S. § 42–162(A)(8)(b). Bahr points out that while subzones may be located anywhere within the state, they still constitute fictional extensions of FTZs, which must be located "in or adjacent to ports of entry under the jurisdiction of the United States." 19 U.S.C. § 81b(a).

¶ 36 Bahr concludes that she has demonstrated that no rational relationship exists between property's "location" in an FTZ and any legitimate basis for taxation at a different rate from that entailed by classification under class three commercial/industrial.

## C. THE VALIDITY OF A.R.S. § 42–162(A)(8)(b)

¶ 37 For the reasons we discuss below, we determine that the classification provided by A.R.S. § 42–162(A)(8)(b) does not violate the Uniformity Clause.

¶ 38 A.R.S. § 42–162(A)(8)(b) states:

(b) Any real and personal property located within the boundaries of a foreign trade zone or subzone established pursuant to 19 United States Code § 81 and title 44, chapter 18. The property classification authorized by this subdivision shall apply only to the area of a foreign trade zone or subzone which has been activated for foreign trade zone use by the district director of the United States customs service, pursuant to 19 Code of Federal Regulations § 146.6.

¶ 39 If we agree that the mere involvement of FTZ or subzone property in foreign trade subject to government regulation cannot rationally support ad valorem taxation of such property at a rate different from that imposed on non-FTZ, non-subzone commercial-or industrial-use property, nonetheless, we need not share Bahr's conclusion that this proposition dooms A.R.S. § 42–162(A)(8)(b) as violative of the Uniformity Clause. Involvement in foreign trade subject to government regulation describes a considerably broader grouping of properties than does that statute. Some items of property within this broad grouping would be included in the class eight FTZ classification, and some would not. The statutory "elements" that Bahr identifies and attacks are generalizations from the actual provisions. Section 42–162(A)(8)(b) does not classify property merely according to its involvement in foreign trade and its subjection to extensive federal regulations.

¶ 40 The classification that A.R.S. § 42–162(A)(8)(b) actually defines is much more restrictive. Class eight FTZ property comprehends only those items of real and personal property in the areas of existing FTZs or subzones that the United States Customs

Service's district director has "activated for *foreign trade zone use.*" (Emphasis added.) Viewed in light of the federal statutes it cites, the language of A.R.S. § 42–162(A)(8)(b) creates a classification consisting of property used by commercial or industrial enterprises that buy, store, or tranship foreign or domestic goods and thereafter import or export them in compliance with procedures established by federal provisions. Such property is excepted from federal customs duties, or else enjoys deferral or accelerated refunding of federal customs duties.

¶ 41 Contrary to Bahr's analysis, this characterization of class eight FTZ property does not turn on physical location, or on politico-industrial cronyism, or on any other illegitimate criterion unrelated to the property's physical attributes, legal nature, use, industry of deployment, utility, productivity, or purpose. *See America West Airlines,* 179 Ariz. 528, 880 P.2d 1074; *Cutter,* 191 Ariz. 485, 958 P.2d 1. Under federal law, the FTZ Board cannot grant authority for an FTZ or subzone project without considering the need for zone services in the port of entry or other relevant area measured against existing and projected international trade activities and employment impact, adequacy of operational and financial plans, appropriateness of site and facilities, compatibility of the zone project with the local community's master plan or economic development goals, and the views of affected persons and companies. 15 C.F.R. § 400.23(a). In granting authority for establishment of a subzone, the Board must also consider other criteria, including whether the proposed subzone would be in the public interest and would generate or advance significant public benefits. 15 C.F.R. § 400.23(b).

¶ 42 Contrary to the implication of Bahr's argument, a company involved in foreign commerce cannot obtain for itself the benefits of FTZ operation by simply moving itself into an existing FTZ or acquiring subzone authorization and then conducting operations as it pleases. If the prospective zone occupant or subzone operator is a manufacturer or processor of goods, it must apply to the Board for authority to engage in that activity in the FTZ. 15 C.F.R. § 400.31(a). In re-

viewing the application, the Board must decide, based on eleven regulatory criteria, whether the activity would be in the public interest. 15 C.F.R. § 400.31(b) and (c)(3). Later on, the Board may restrict or terminate the zone occupant or subzone operator's authority to conduct manufacturing or processing operations if it determines they are no longer in the public's interest. 15 C.F.R. § 400.31(d)(3).

¶ 43 Regardless of whether the prospective zone occupant or subzone operator engages in manufacturing or processing, its zone operations are substantially and uniquely circumscribed under federal law. The Board may restrict or prohibit any admission of merchandise into a zone project or operation in a zone project if it determines after review that the activity is detrimental to the public interest, health, or safety. 15 C.F.R. § 400.43. 15 C.F.R. § 400.41 provides:

Zones shall be operated by or under the contractual oversight of zone grantees, subject to the requirements of the Act and this part, as well as those of other federal, state and local agencies having jurisdiction over the site and operation. Zone grantees shall ensure that the reasonable zone needs of the business community are served by their zone projects. The Port Director represents the Board with regard to the zone projects in the district and is responsible for enforcement, including physical security and access requirements, as provided in 19 CFR part 146.

¶ 44 Unlike a warehousing or manufacturing concern engaged in foreign trade from outside an FTZ or subzone, a zone occupant or subzone operator may claim the tariff benefits of "exporting" goods that actually have not left the borders of the United States by obtaining a customs declaration that the goods are held as "zone-restricted merchandise." Conversely, also unlike concerns that engage in foreign trade from outside an FTZ or subzone, a zone occupant or subzone operator may not change its mind about whether particular goods previously designated as zone-restricted merchandise can or will be exported without obtaining Board approval or that of its Executive Secretary. 15 C.F.R. § 400.44. Similarly, no

zone occupant or subzone operator may engage in the retail trade, subject to exceptions that the Board may allow in narrow circumstances on application of the occupant/operator.

¶ 45 An established FTZ or subzone cannot be operated as such until the zone operator or grantee obtains the approval of the local director of United States Customs, referred to as "activation" of the FTZ or subzone. Activation requires submission of comprehensive information concerning the operator or grantee and its officers and managers; the physical configuration of the zone or subzone; the operator or grantee's inventory control and recordkeeping system; and an FTZ operator's bond. 19 C.F.R. § 146.6(d) and (e); see generally 19 C.F.R. §§ 146.7.

¶ 46 Zone occupants and subzone operators are subject to United States Customs officers' supervision of their merchandise and records. 19 C.F.R. §§ 146.3; 146.8—146.13; 146.21—146.24. None may refuse access to a Customs officer. Id. An FTZ operator must maintain an inventory control and recordkeeping system for the zone, keep the records for five years after the related merchandise has left the zone, and keep proprietary information confidential subject to customs review. 19 C.F.R. § 146.4. The operator must also maintain the zone and establish adequate security procedures to protect merchandise stored in the zone, for which purpose he may provide guards or guard services. Id.

¶ 47 Bahr is mistaken in contending that under these circumstances A.R.S. § 42–162(A)(8)(b) causes differential taxation of property "with similar physical attributes and productiveness, used the same way and for the same purpose by owners in the same industry." America West, 179 Ariz. at 532–33, 880 P.2d at 1078–79.

¶ 48 A court must examine the relevant properties' physical attributes, productivity, use, purpose, and the industry of deployment and use. Id. at 533 n. 4, 880 P.2d at 1079 n. 4. The statutory classification runs afoul of the Uniformity Clause only if the properties under comparison have all these factors in common. See id.

¶ 49 Here they do not. Under the detailed, comprehensive federal provisions that govern foreign trade zones, a business that engages in significant international commerce in an activated FTZ is no longer solely a private entity organized to make money. It now also functions as a vehicle or mechanism through which the United States Government has chosen to implement the policies that underpin the FTZ Act—those of increasing the general competitiveness of United States industries in international trade, boosting the United States economy by diminishing the damage caused by unfair international competition, providing increased job opportunities for United States residents, and furthering the states' and local communities' overall economic development plans and objectives.

¶ 50 All the property used in such a business is thus directed both toward making money and toward furthering these federal policies. Property of that kind accordingly has a "utility" and "purpose" that otherwise similar property of non-FTZ businesses engaging in international commerce do not share. Further, because it is the FTZ business's actual operation under an activated FTZ regime that gives rise to this unique utility and purpose, its property is rationally distinguishable even from that of non-FTZ businesses that could qualify as FTZ occupants or subzone operators but have simply chosen not to apply.

¶ 51 Additionally, businesses that engage in significant international commerce in activated FTZs cannot be said to be in precisely the same "industry" as their non-FTZ counterparts in the general domestic economy. It follows tautologically that the property of FTZ businesses and that of their counterparts are not used "in the same industry."

¶ 52 Finally, we reject Bahr's contention that the class eight FTZ classification is location-based. Though A.R.S. § 42–162(A)(8)(b) ostensibly defines class eight FTZ property as a function of location, the language of the statute as a whole reveals a different meaning. What brings property within class eight is not its location, but rather its use in fur-

thering the purposes for which FTZs are permitted to exist.[7]

¶ 53 Bahr fails to overcome the "strong presumption" that A.R.S. § 42–162(A)(8)(b) is constitutional. *See Republic Investment Fund I v. Town of Surprise,* 166 Ariz. 143, 148, 800 P.2d 1251, 1256 (1990). The class eight FTZ classification created by A.R.S. § 42–162(A)(8)(b) is not facially invalid under Arizona's Uniformity Clause.

### CONCLUSION

The judgment of the trial court is affirmed.

CONCURRING: SUSAN A. EHRLICH, Judge, and E.G. NOYES, JR., Judge.

**7.** Nothing in this record suggests that FTZs or subzones are used, or even capable of being used, as storage depots for business property that has no reasonable relationship to the zone's operation or purpose. Nothing in this opinion would preclude assessment of such property as if it were not "located" in the FTZ. We need not further explore that possibility here.